IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

In re:                                        *

WHISKEY ONE EIGHT, LLC                        *          Case No: 15-19885-DER
                                                         (Chapter 11)
        Debtor                                *

    *      *      *      *      *      *      *      *      *      *      *      *

DEBTOR'S OPPOSITION TO EMERGENCY
MOTION TO DISMISS VOLUNTARY BANKRUPTCY PROCEEDING

        Whiskey One Eight, LLC, the debtor and debtor in possession (the "Debtor"), by

Yumkas, Vidmar & Sweeney, LLC, files this Debtor's Opposition to Emergency Motion to

Dismiss Voluntary Bankruptcy Proceeding (the "Opposition").  In support of this Opposition, the

Debtor states as follows:

Introduction

        1.      The Debtor initiated this bankruptcy case by filing a voluntary petition

(the "Petition") on July 15, 2015 (the "Petition Date") so that it could reorganize, pay holders of

allowed claims in full, and maximize value for interest holders by staying a foreclosure by

FAIRMD, LLC ("Fairway" or the "Movant") of the Debtor's valuable real estate on July 16,

2015.  The filing of the Petition was duly authorized pursuant to the Debtor's operating

agreement and under applicable law.   Fairway's Emergency Motion to Dismiss Voluntary

Bankruptcy Proceeding (the "Motion to Dismiss"), which was filed on the Petition Date, is based

solely on an inaccurate assertion that the Petition was not authorized by the Debtor's members.

As described more fully below, Fairway's Motion to Dismiss should be denied because (i) it

does not have standing to object to the authority of the Debtor, and (ii) its sole argument is

baseless.

Background

        2.      The Debtor is a Maryland limited liability company that owns a valuable

50 acre parcel, more or less, of real estate in the Laurel section of Anne Arundel County (the

"County"), Maryland.  The property is located at 520 Brock Bridge Road, Laurel, Maryland 20724 and is commonly known as Riverwood ("Riverwood" or, the "Property").

3.       The Debtor is owned by three (3) members:  Richard Polm, who has a 37.5% interest, his former wife Theresa Polm, [1] who has a 37.5% interest, and Andrew Zois, who has 25% interest (collectively, the "Members").

4.       The current agreement of the Members with respect to the management of the business and affairs of the Debtor is set forth in the Second Amendment and Restatement of Operating Agreement of Whiskey One Eight, LLC (the "Operating Agreement"), dated March 29, 2007.  A true and accurate copy of the Operating Agreement is **Exhibit 1** hereto and is incorporated herein by reference.  Specifically, the Operating Agreement provides that the Debtor is manager-managed and that the manager has "full, exclusive and complete discretion, power and authority" over the business and affairs of the Debtor for the purpose of engaging, *inter alia*, in the business of real estate investment.  *See* Operating Agreement, Sections 5.2 and 2.3.

5.       From the Debtor's date of organization and continuing until October 9, 2013, Richard Polm was the manager of the Debtor.

6.       At all times since the Debtor's organization on August 9, 2005, Mr. Polm was to provide the funds to acquire, rezone and develop the Property to approved subdivision plat approval. Mr. Zois was to obtain increased zoning, develop the Property and obtain final sub-plat authority needed in order to maximize value and sell parcels of the Property to multiple homebuilders.

7.       To this end, on January 31, 2007 an affiliate and solely owned entity of Mr. Polm's, Polm Development Limited Partnership ("Polm Development"), as borrower, took out a $5 million line of credit from Severn Savings Bank, FSB ("Severn Bank") for the purpose of paying for the acquisition, rezoning and development costs for the Property through final sub-plat approval (the "Severn Loan").  The Promissory Note (the "Note") for the Severn Loan was executed by Richard Polm as president of Bay Country Land Company, a general partner of

---

[1]   Theresa Polm is the ex-wife of Richard Polm

Polm Development.  A true and accurate copy of the Note is **Exhibit 2** hereto and is incorporated herein by reference.

8.      The Debtor, along with Mr. Polm, Ms. Polm, Mr. Zois and other entities affiliated with Mr. Polm, provided guaranties of the Severn Loan.  Specifically, the Debtor executed and delivered a Guaranty of Payment (the "Guaranty") dated January 31, 2007.  A true and accurate copy of the Guaranty is **Exhibit 3** hereto and is incorporated herein by reference.

9.      The Guaranty is secured by a first-priority lien on the Property granted pursuant to that certain Indemnity Deed of Trust from the Debtor for the benefit of Severn Bank (the "IDOT"), and recorded in the land records of Anne Arundel County, Maryland at Liber 18786, Folio 456.  A true and accurate copy of the IDOT is **Exhibit 4** hereto and is incorporated herein by reference.  The IDOT contains 2 notable provisions relating to an inevitable objection by the Debtor to the validity of Fairway's claim against the Debtor: (i) the IDOT expressly states that the Debtor, as grantor, is "secondarily and not primarily liable" to Severn Bank on the loan to Polm Development. (IDOT at Sixth Whereas Clause); and, (ii) it states that "the proceeds of [the Severn Loan] are intended to be used to improve the Property [described in Exhibit A to the IDOT]" (IDOT at First Whereas Clause).

10.      Beginning in 2005 and continuing until May 2011, Mr. Zois worked with County officials and succeeded in obtaining zoning approval to increase the density of residential development on the Property from R-1, which permits only one home per acre (50 total units), to R-22 which permits twenty-two homes per acre (1,100 total units).  As a result of this zoning change, the Property, which was originally acquired for approximately $1 million, is now worth approximately $14 million pursuant to appraisals obtained by both Severn Bank and, more recently, by the Debtor.  Pursuant to the Debtor's business plan, the Debtor expects to obtain preliminary sub-plat approval in the next twelve to eighteen months, and final sub-plat approval within two years thereafter.  When it reaches each of these plat approval benchmarks, the Debtor's interest in Riverwood will increase substantially in value.

11.      It is undisputed that the Debtor used $1.7 million of the Severn Loan proceeds to acquire the Property and to pay for costs relating to changing the zoning from R-1 to

R-22.  It is also undisputed that, contrary to the express terms of the IDOT's restriction on use of funds, Mr. Polm diverted the remaining $3.3 million of the Severn Loan to pay for personal expenses, including, among other things, buying a Lamborghini and a show horse.  It is also undisputed that the $3.3 million taken by Mr. Polm from the Severn Loan, would have provided the Debtor with enough money to fund the development of the Property to final sub-plat approval.

12.     Indeed, had Mr. Polm not misspent the $3.3 million balance of the Severn Loan, and thus Mr. Zois been permitted to commence with the subdivision process following the May 16th, 2011 rezoning of the Property, there would not have existed the prospect of either foreclosure or bankruptcy, as the Property would have been sold more than a year ago after having received its final plat approval.

13.     Upon discovering the actions of Mr. Polm in diverting a majority of the proceeds of the Severn Loan away from the development of the Property to his own ends and encountering resistance from him to complete the Project, Mr. Zois and Ms. Polm removed Richard Polm as manager by written action dated October 9, 2013 and authorized Andrew Zois as Manager.  Mr. Zois remains the Debtor's Manager today.  Mr. Polm challenged the validity and effectiveness of his removal in Circuit Court for Anne Arundel County and on May 23, 2014, the Court entered its Order Granting Declaratory Judgment in Favor of Andrew Zois, finding that "Andrew Zois is 'Manager' of the LLC [Debtor] effective October 9, 2013" (the "Order").  A true and accurate copy of the Order is Exhibit 5 hereto and is incorporated herein by reference.

14.     At some point, Polm Development – which is solely owned by Richard Polm – ceased making any loan payments to Severn and thereby created a default in the Severn Loan which exposed the Property to foreclosure under the IDOT; upon information and belief, Richard Polm took no steps to seek a refinance of the Severn Loan to avoid the default and has, instead, promoted the default in the Severn Loan and the resulting foreclosure action.

15.     In its current state, the Property generates nominal income from its small airport tenant.  The Debtor does not have funds on hand to repay any allowed portion of the

Severn Loan, which, the Debtor asserts, should be no greater in amount than $1.7 million. The Debtor anticipates seeking approval to obtain DIP financing in short order that will fund both its reorganization and its continued development.

16.     Fairway apparently acquired Severn Bank's interest in the Severn Loan through multiple transactions during 2015, with the final transaction closing just 2 days prior to the Petition Date. Fairway, whose address on SDAT's website is identical to Richard Polm's business address at "Suite 101, 303 Najoles Road, Millersville, Maryland," [2]scheduled a foreclosure to take place on July 16, 2015. Clearly, Mr. Polm was counting on Fairway to foreclose on Riverwood so it could wipe out the existing ownership interests of Mr. Zois and Ms. Polm and then proceed to jointly develop the Property with Mr. Polm.

<u>Fairway's Motion to Dismiss</u>

17.     In its Motion to Dismiss, Fairway asserts that the Debtor's bankruptcy case should be dismissed because the Petition was not duly authorized under law because the resolution attached to the Petition did not contain Mr. Polm's authorization. The Debtor assets that Fairway does not have standing to raise this issue. Even if the Court were to find otherwise, Fairway's Motion to Dismiss must be denied because it is baseless as the Operating Agreement, empowers either the Manager, acting in his sole discretion, and/or a majority of the members to authorize the filing of the Petition.

<u>Argument</u>

**I.     Fairway's Motion to Dismiss should be denied because, as a creditor, it lacks standing to challenge the Debtor's authority to file for Bankruptcy protection**

**A.     Creditors do not have standing to raise issues of authority to file a petition.**

18.     Creditors do not have standing to raise issues of authority to file a petition on behalf of an entity. *Royal Indemnity Co. v. American Bond & Mortgage Co.*, 289 U.S. 165, 53 S.Ct. 551, 77 L.Ed. 1100 (1933); *Matter of Verrazzano Towers, Inc.*, 10 B.R. 387, 391 (Bankr. E.D.N.Y 1981); *In re E.T. Russel Co.*, 291 F. 809, 818 (D. Mass. 1923).

---

[2]  This same address is shared by Polm Development, Polmco Management, Inc., Bay Country Land Company, and numerous other entities which are either the solely owned or majority owned companies of Richard Polm.

19.     The Supreme Court in the *Royal Indemnity* case held:

> Even if the action of directors authorizing the filing of a voluntary
> petition ... were in excess of the authority conferred, or otherwise
> invalid, creditors could not for that reason attack the consequent
> adjudication. The question is purely one of the internal
> management of the corporation. Creditors have no standing to
> plead statutory requirements not intended for their protection. If
> the stockholders' rights had been infringed, and they chose to
> waive them, a creditor could not assert them in opposing an
> adjudication.

289 U.S. 165, 171, 53 S.Ct. 551, 554, 77 L.Ed. 1100 (1933).

20.     Several other courts follow the rule set forth in *Royal Indemnity* that
generally a creditor may not challenge a corporate filing on the ground that it was not properly
authorized. *In re John Hicks Chrysler–Plymouth, Inc.,* 152 B.R. 503 (Bankr.E.D.Tenn.1992); *In
re Professional Success Seminars International, Inc.,* 18 B.R. 75 (Bankr.S.D.Fla.1982)
("Creditors may not move to vacate a voluntary order for relief because of some irregularity in
the meeting authorizing the filing of the petition, or on the ground that it was not authorized by
the stockholders or corporate directors"); *In re Southwest Equipment Rental,* 152 B.R. 207, 210
(Bankr.E.D.Tenn.1992) ("[A]s a general rule, a creditor does not have standing to object to a
corporation's voluntary bankruptcy case on the ground that the board of directors did not
properly authorize it.").  The Court in *Southwest Equipment* found the law to be essentially the
same at the time of the *Royal Indemnity* decision and found that the Supreme Court's holding
maintained its vitality. *Id.* 208. See also, *In re Sterling Mining Co.*, No. 09-20178TLM, 2009
WL 2475302, at *6 (Bankr. D. Idaho Aug. 11, 2009) (Creditor "lacks standing to urge the
dismissal of this case on the ground that Sterling's board of directors did not properly authorize
the same."). *Id.*

21.     Section 1109 of the Bankruptcy Code does not grant standing to Fairway
on this issue any more than if Fairway argued instead that it grants them standing to file a motion
to sell the Debtor's property or to seek to hire counsel to represent a debtor.  As a creditor,
Fairway does have standing to file a motion to dismiss.  However, it lacks standing to raise the
lack of member authority as a substantive ground.

22.     It is undisputed that Fairway is a creditor of Polm Development, a company owned by Mr. Polm, and by virtue of the guaranty, the holder of a disputed claim against the Debtor.  It is also undisputed that Fairway is not a member of the Debtor.  The authorities cited above deny creditors of corporate debtors standing to challenge a bankruptcy petition on the ground that it was not properly authorized.  Accordingly, Fairway's Motion to Dismiss should be denied as it lacks standing to challenge the Debtor's authority to file for bankruptcy protection.

## II.     The Petition Was Duly Authorized by the Debtor's Operating Agreement and Applicable Law

23.     Regardless of whether this court finds that the Movant has standing, the motion must be denied because the substantive argument made by the Movant is flawed.  This is a dispute as to the ultimate source of authority for the Debtor to file bankruptcy.  The Movant asserts that the default provisions contained in a 2013 amendment to the Maryland Limited Liability Act at Md. Corp. & Ass'ns Code Ann. § 4A-101, et seq. (the "Act") apply.  The Debtor asserts that the authority comes from agreement of the members as set forth in the Operating Agreement.

24.     The Act, by its terms, recognizes and defers to the members' freedom of contract with respect to the management of the business and affairs of LLCs.

25.     The Act expressly states that its default provisions apply "unless otherwise agreed."  Md. Corp. & Ass'ns Code Ann. § 4A-403(a).  Another bankruptcy court in Maryland has considered this phrase.  Judge Catliota concluded that "[u]nder the Act, the phrase "unless otherwise agreed" means unless the members have otherwise agreed in the articles of organization, the operating agreement or in a separate unanimous consent of the members." *In re Solomons One, LLC*, No. 13-24475-TJC, 2013 WL 5934656, at *7 (Bankr. D. Md. Oct. 31, 2013) (citing Md. Corp. & Ass'ns Code Ann. § 4A-403(a)).  In further considering operating agreements, the court stated:

> [A]n LLC's operating agreement is interpreted in accordance with prevailing contract law. *See Condo v. Conners*, 266 P.3d 1110, 1115 (Colo.2011) (finding that the LLC's operating agreement should be interpreted "in light of prevailing principles of contract

law."); *see also In re Seneca Invs. LLC,* 970 A.2d 259, 261 (Del. Ch.2008) ("An LLC is primarily a creature of contract, and the parties have wide contractual freedom to structure the company as they see fit.").

\*      \*      \*

Maryland follows the law of objective contract interpretation. *Cochran v. Norkunas,* 919 A.2d 700, 709 (Md.2007); *see also Myers v. Kayhoe,* 892 A.2d 520, 526 (Md.2006); *Calomiris v. Woods,* 727 A.2d 358, 363 (Md.1999). *When interpreting a contract, the court is tasked with determining "from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." General Motors Acceptance Corp. v. Daniels, 492 A.2d 1306, 1310 (Md.1985).*

*In re Solomons One, LLC*, No. 13-24475-TJC, 2013 WL 5934656, at \*5 (Bankr. D. Md. Oct. 31, 2013) (emphasis added). The caselaw calls for a review of the entirety of the contract to determine the intent of the parties at the time the agreement was effectuated. The Movant agrees insomuch as the Movant summarizes *In re Solomons One* as a case that "demonstrates that the courts may infer the requisite approval from a review of the operating agreement *in its entirety*." Motion to Dismiss, p. 10.

26.      In this case, the agreement of the members is set forth in the Operating Agreement and there are three sources of authority for the bankruptcy filing contained therein:

(a)      Section 5.2 of the Operating Agreement grants the Manager the full, exclusive and complete discretion to manage the business and affairs of the Debtor for the purposes set forth in the Operating Agreement, and is set forth in relevant part as follows:

5.2.      <u>General Powers</u>. The Manager shall have **full, exclusive and complete discretion, power and authority,** subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to **manage, control, administer and operate the business and affairs of the Company** [the Debtor] **for the purposes herein stated**, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to:

\*      \*      \*

5.2.9.   execute any and all other instruments and documents which may be necessary or in the opinion of the Manager desirable **to carry out the intent and purpose of this Agreement**, including, but not limited to, documents

> whose operation and effect extend beyond the term of the
> Company;
>
>                 \*       \*       \*
>
> 5.2.11. enter into any kind of activity necessary to, in
> connection with, or incidental to, the accomplishment of
> the purposes of the Company;

Operating Agreement, Section V (emphasis added). *See id.* The express purpose of the Debtor is to engage in the business of real estate investment and to do anything else permitted by Section 4A-203 of the Corporations and Associations Article of the Annotated Code of Maryland. *See* Operating Agreement, Section 2.3. Any business needs time, capital and a business plan. The bankruptcy case affords the Debtor all three. Not only was the bankruptcy filing related to the purpose of the Debtor, in the judgment of the Manager and a majority of Members, it was necessary and desirable to accomplish the purposes of the Debtor, because it affords the Debtor time to execute a plan and restructure its debt so that it can realize the full value of this rapidly appreciating parcel of real property.

        (b)        Section 5.6.2 of the Operating Agreements provides that the vote or consent of Members holding a 51% interest is sufficient to approve any matter requiring the approval of or consent by the Members. Specifically, Section 5.6.2 of the Operating Agreement states:

> 5.6.2. Except as otherwise provided in this Agreement, the
> affirmative vote of the Members holding fifty-one percent
> (51%) or more of the Percentages then held by Members
> shall be required to approve any matter requiring the
> approval of or consent by the Members.

Operating Agreement, Section 5.6.2. Even in the event of an extraordinary transaction, as identified in a list in Section 5.3 of the Operating Agreement, the affirmative vote of only 51% or more of the membership interests is necessary for approval. Even though it is not identified as such, the gravity of a bankruptcy is commensurate with the extraordinary acts that are expressly identified, namely capital transactions, borrowing or lending money in excess of $10,000, admitting additional members, and engaging in business in jurisdictions that do not recognize limited liability companies. In this case, Theresa Polm and Andrew Zois collectively hold 62.5%

of the membership interests in the Debtor.  These Members duly executed a Written Consent in Lieu of Meeting (the "Written Consent"), in accordance with Section 5.6.3 of the Operating Agreement.  A true and accurate copy of the Written Consent is **Exhibit 5** hereto and is incorporated herein by reference.  In the Written Consent, the Members resolved [that it was in the best interests of the Debtor] to file a voluntary bankruptcy petition for the Debtor.

        (c)      Section 5.6.4, cited by the Movant, provides that absent an agreement to the contrary, the provisions of the Act requiring unanimous consent will apply. The Movant argues that when Sections 5.6.2 (requiring 51%) and 5.6.4 (requiring unanimous consent when required by the Act unless otherwise provided) are read together, the specific provision will take precedence over the general one, and control it.  *See Fed'l Ins. Co. v. Allstate Ins. Co.*, 275 Md. 460, 341 A.2d 399 (1975); *see also Macke Laundry Serv. Ltd. P'ship v. Alleco, Inc.*, 743 F.Supp. 382 (D. Md. 1989) ("[It is a] well-settled rule of contract construction that a specific provision will control over a general provision where such provisions are arguably in conflict."); *Kronovet v. Lipchin*, 288 Md. 30, 415 A.2d 1096 (1980) ("If there is a conflict or inconsistency between general provisions and specific provisions of a contract, the specific provisions qualify the meaning of the general provisions."); *Hartford Underwriters Ins. Co. v. Phoebus*, 187 Md. App. 668, 979 A.2d 299 (2009) ("[I]n construing contradictory provisions, we give preference to specific provisions over general provisions.").  The Movant argues that the more specific provision is Section 5.6.4.  The Debtor disagrees as Section 5.6.4 is the more general of the two provisions.  Section 5.6.4 points to the default rule under the Act.  The default rule should be applied only when the operating agreement is silent.[3]  *See Clancy v. King*, 405 Md. 541, 556, 954 A.2d 1092, 1101 (2008).  The Movant even acknowledges the general nature of the default rule by arguing that "[n]either the provisions of the operating agreement, nor the historical conduct of the members' business decisions justify departing from the general rule within the Act . . ."  Motion, p. 8.  Section 5.6.2 is more specific than Section 5.6.4 as Section 5.6.2 states the exact percentage required to take action as agreed to by the Members.  In contrast, Section 5.6.4 redirects to the default rule under the Act, which should be applied only in

---

      [3]  As described above, the Operating Agreement here is not silent.

the absence of a more specific provision in the Operating Agreement.  Since Section 5.6.2 is

more specific that Section 5.6.4, Section 5.6.2 controls.  *See Macke Laundry Serv. Ltd. P'ship v.*

*Alleco, Inc.*, 743 F.Supp. 382 (D. Md. 1989).  Therefore, a correct application of the law here

leads to the conclusion that Section 5.6.2 prevails and should be applied here (if it is determined

that Section 5.2 is not dispositive).  As described in paragraph 26(b) above, the Debtor's filing

was properly authorized under Section 5.6.2 as the action passed a vote with 62.5% in favor of

the action.  As such, unanimous consent was not required to authorize the Debtor's bankruptcy

filing under the Operating Agreement.

      27.     Critical to the Movant's argument, § 4A-403 of the Act, which was not

added to the Act until the 2013 amendments, provides that absent an agreement to the contrary, a

bankruptcy filing requires unanimous consent of the members.  It is set forth in relevant part

below:

> (a)  The provisions of this Section apply unless otherwise provided
> in this title or **unless otherwise agreed**.

>             *        *        *

> (d)(2)  A member may not take any of the following actions
> without the unanimous consent of the members:

>> (i)  Institute a voluntary proceeding under the federal
>> bankruptcy code;

Md. Code Ann., Corps. & Ass'ns § 4A-403 (emphasis added).

      28.     By its terms, the default provision of § 4A-403 only applies absent an

agreement to the contrary.  Accordingly, it must be determined whether either Section 5.2 or

Section 5.6.2 of the Operating Agreement, discussed in detail above, constitute an agreement of

the members to the contrary.

      29.     This determination can be made by considering the authority of the Debtor

to file for bankruptcy prior to 2013.  Prior to the 2013 amendments the Act did not require

unanimous consent for a bankruptcy filing, yet Fairway does not argue that, prior to 2013, the

Debtor would have been precluded from filing for bankruptcy.  So, prior to 2013, what authority

could the Debtor have relied on to file a petition?  It could have been only the agreement of the members as set forth in either Section 5.2 or Section 5.6.2 of the Operating Agreement.

30.     In conclusion, § 4A-403 of the Act provides a default provision requiring unanimous consent only in the absence of an agreement of the Members to the contrary.  In this case, the Members agreement otherwise is set forth in Section 5.2 and Section 5.6.2 of the Operating Agreement.  Such agreement was effective in 2007 and continues in effect today.

31.     The written consent, executed by the Manager and by holders of 62.5% of the Percentages, satisfies the requirements of both provisions and, accordingly, the Motion must be denied.

<u>Waiver of Memorandum</u>

32.     Pursuant to Local Rule 9013-2, no memorandum of fact and law will be filed, and the Debtor will rely solely upon this Opposition.

<u>Conclusion</u>

33.     For the foregoing reasons, the Movant's Motion to Dismiss should be denied.

/s/ Lawrence J. Yumkas
Lawrence J. Yumkas, 06357
Yumkas, Vidmar & Sweeney, LLC
10211 Wincopin Circle, Suite 500
Columbia, Maryland  21044
(443) 569-0758
lyumkas@yvslaw.com

Counsel for Debtor

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 29th day of July 2015, notice of filing the Debtor's Opposition to Emergency Motion to Dismiss Voluntary Bankruptcy Proceeding (the "Opposition") was sent electronically to those parties listed on the docket as being entitled to such electronic notices, and a copy of the Opposition was mailed first class, postage prepaid to the parties on the attached service list.


                                               /s/ Lawrence J. Yumkas
                                         Lawrence J. Yumkas

Kevin M. Schaeffer, Esquire
Counsel for Theresa Polm
Council Baradel Kosmerl & Nolan, P.A.
125 West Street, Fourth Floor
Annapolis, Maryland  21401


The following parties received
electronic notice of the filing:


Michael C. Bolesta, Esquire
Counsel for FAIRMD LLC
Gebhardt & Smith LLP
One South Street, Suite 2200
Baltimore, Maryland  21202

Katherine A. Levin, Esquire
Office of the U.S. Trustee
101 West Lombard Street, Suite 2625
Baltimore, Maryland  21201

Lawrence J. Yumkas, Esquire
Counsel for Debtor
Yumkas, Vidmar & Sweeney, LLC
10211 Wincopin Circle, Suite 500
Columbia, Maryland  21044